# THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

KIMBERLIN W. MCKITRICK,        )
        )
        **Plaintiff,**       )
        )      **CIVIL ACTION**
**v.**        )
        )      **No. 04-2377-KHV**
**JO ANNE B. BARNHART,**        )
**COMMISSIONER OF SOCIAL SECURITY,**        )
        )
        **Defendant.**       )
_____)

## MEMORANDUM AND ORDER

Kimberlin W. McKitrick brings suit under 42 U.S.C. §§ 405(g) seeking judicial review of the Commissioner's decision to deny disability benefits under Title II of the Social Security Act ("SSA"), 42 U.S.C. § 401 et seq., and supplemental security income ("SSI") benefits under Title XVI of the SSA, 42 U.S.C. §§ 1381 et seq.[1] This matter is before the Court on plaintiff's Motion For Judgment (Doc. #3) filed November 24, 2004. For reasons stated below, the Court sustains plaintiff's motion in part.

## I.      Procedural Background

On August 3, 2000, plaintiff filed applications for SSI and disability insurance benefits, claiming that he was disabled beginning April 22, 1999. Tr. 78. Specifically, plaintiff claimed that the following illnesses, injuries or conditions limited his ability to work: hepatitis C, nerve damage to right shoulder, significant hearing loss, osteoarthritis, ground-off tip of left index finger, foot deformity, poor circulation, memory loss

---

[1]     Two social security disability benefit programs are available: disability insurance for qualified individuals who paid social security taxes for the relevant period, and SSI for individuals who did not. The pertinent regulations are the same for both programs. See Eads v. Sec'y of Dep't of HHS, 983 F.2d 815, 816 (7th Cir. 1993).

and mental confusion.  Tr. 91.  On June 18, 2003, an Administrative Law Judge ("ALJ") conducted an

evidentiary hearing regarding plaintiff's claim.  Tr. 337-70.  On July 10, 2003, the ALJ found that plaintiff

was not disabled.  Tr. 31-38.  The Appeals Council denied plaintiff's request for review.  Tr. 14-17.

**II.      Factual Evidence**

   **A.      Plaintiff's Testimony**

   Plaintiff testified to the following facts.

   Plaintiff is 44 years old, 5 feet, 6½ inches tall, and he weighs 145 pounds.  Tr. 340.  He is married

and has two adult children.  He completed the ninth grade and later obtained a graduate equivalency degree

(GED).  Tr. 341.  Plaintiff has been diagnosed with Hepatitis C.  Tr. 344.  He is not currently receiving

treatment for the condition because no new medications exist for him to try.  Tr. 344.  He twice tried

Rebetron interferon, but it made him sick and did not improve his symptoms.  Tr. 344-45, 348.

   Until 1999, plaintiff worked as a heavy industrial repair machinist.  Tr. 341.  In that capacity, he

fixed old equipment for which parts were no longer available.  Tr. 341.  The job required him to lift 150

pounds about three to four times a week.  Tr. 342.  In 1999, plaintiff was fired for making mistakes and

missing too many days of work.  Tr. 343. 346.  At the time, he was undergoing Rebetron treatment, which

made him extremely sleepy.  Tr. 346.

   Plaintiff sleeps at least 18 hours a day.  Tr. 349.  He generally wakes in the morning between 8:00

a.m. and 10:00 a.m. and sits in a chair for a couple hours.  Tr. 347.  He is back asleep by noon and he

naps until 3:00 or 4:00 p.m., when he gets up and makes a sandwich or something to eat and then goes

back to sleep.  Tr. 347-48.

   Activities make plaintiff sick.  Tr. 347.  He does not help with chores around the house and he does

2

not engage in outside hobbies.  Tr. 347-48.  He used to build go-carts and ride bicycles, three-wheelers and ATVs, but he stopped about six years ago due to pain.  Tr. 348.  He socializes with his wife's cousins about once a month or once every two months.  Tr. 348.

Plaintiff suffers from abdominal pain and pain in his joints.  If he sits up for half an hour, he experiences pain in his lower back and has to lie down to alleviate it.  Tr. 349.  If he stands for half an hour, his feet and legs get so tired that he has to sit down.  Tr. 349.  He can walk about half an hour in Wal-Mart before he starts telling his wife that they have to go home.  Tr. 349.  His doctor has not given him permanent lifting restrictions, but he said that plaintiff cannot do things that he used to do.  Tr. 349.  Plaintiff used to be able to lift 150 pounds, but today he suffers excruciating pain in his lower back if he lifts a 22-pound bag of dog food.  Tr. 349-50.  Because of the pain, plaintiff's wife now lifts the dog food.  Tr. 350.

Plaintiff would have difficulty performing a light-duty job because of fatigue.  After working an hour, he would need to sleep for 20 or 30 minutes.  If he could perform a job sitting down, he could sustain activity for 90 minutes but he would have to lie down for a couple of hours afterwards.  Tr. 350.  He could perform a job standing up for 30 minutes but he would need to sleep for two hours afterwards.  Tr. 351.

During the last six months plaintiff has lost about 20 pounds due to his inability to keep food down. Tr. 345.  Plaintiff used to smoke marijuana, but he quit two years ago.  Tr. 346.

**B.  Plaintiff's Wife's Testimony**

Rhonda Elaine McKitrick, plaintiff's wife, testified to the following facts:

Rhonda and plaintiff have been married 15 years.  Tr. 352.  From 8:00 a.m. to 5:00 p.m., Rhonda works in Independence, Missouri.  Tr. 352.  When Rhonda leaves for work, plaintiff is sometimes awake and sometimes asleep.  Tr. 353.  On most days, plaintiff does not do anything around the house.  Tr. 354.

3

If he has a good day, he might fix something around the house.  Tr. 354.  Sometimes he will mow the lawn with a riding lawn mower, but he usually asks a neighbor to do it.  Tr. 354.  At least three or four days a week, plaintiff has bad days.  Tr. 354.  On those days, he does not do anything but rest.  Sometimes his bad days last an entire week.  Tr. 354.  Plaintiff and his wife do not socialize anymore because it is impossible to predict whether plaintiff will be having a bad day or a good day.  Tr. 354.

Plaintiff enjoys reading and watching television, but he now must read things several times before he can comprehend them.  Tr. 354-55.  If plaintiff had a light duty job, he would not be able to work every day because some days he is too ill to get out of bed.  Tr. 355.  At least four days a week plaintiff spends the day sleeping in bed or in a Lazy Boy chair.  Tr. 355.

Rhonda usually shops for groceries alone.  Tr. 356.  She and plaintiff used to go shopping and go out to eat together, but they hardly do it anymore.  Tr. 356.  They recently shopped for plaintiff's shoes, but they have not dined out in over six months.  Tr. 356.

Plaintiff has had difficulty with concentration since the time that he had interferon and Rebetron therapy.  A side effect of the medicine is mental confusion, and the symptoms did not disappear after plaintiff finished the treatment.  Before the treatment, plaintiff was very intelligent – a genius in her opinion.  Tr. 356.  He used to do difficult math problems in his head.  Tr. 356-57.  Now he has difficulty adding and subtracting in his head.  Tr. 357.

Rhonda does not know how her husband developed cirrhosis of the liver and hepatitis C.  Tr. 357.  A specialist opined that he probably had hepatitis C for at least 20 years, since he was a teenager.  Tr. 357-58.  He might have acquired the disease when he was 14 years old and had a blood transfusion because of a chainsaw cut to his leg.  Tr. 357-58.  Rhonda has never known plaintiff to drink heavily.  Tr.

4

357.  He quit drinking completely in 1997, when he was diagnosed with hepatitis C.  Tr. 357.  Rhonda has

known plaintiff to use marijuana but no other drugs.  Tr. 358.

When plaintiff was able to work, he was a workaholic.  Tr. 358.  He loves to work.  Tr. 358.  The

fact that he cannot work depresses him.  Tr. 358.

### C.    Medical Evidence

On August 5, 1997, plaintiff visited Charles L. Brooks, M.D., regarding complaints of  fatigue,

intermittent nausea, rare episodes of vomiting, myalgias, marked lethargy and excessive sleeping.  Tr. 181.

At the time, plaintiff was 39 years old.  Tr. 181.  Dr. Brooks noted that plaintiff learned that he had hepatitis

C about a year earlier, when he tried to donate blood.  Tr. 181.  Dr. Brooks noted the following history

regarding plaintiff:

> . . . He denies blood transfusions, exposure to individuals with hepatitis, sharing manicure
> equipment or body piercing.  He was involved in IV drug use approximately every other
> month for four or five years in his early 20' s.  He always used clean needles.  He tried
> tattoos on himself when he was 18 or 19 (5 tattoos over a 3-month time period). . . .

Tr. 181.  Plaintiff reported that he had smoked seven to eight joints of marijuana per day since he was 13

years old.  Tr. 182.  Dr. Brooks observed probable hepatitis C and suspected that plaintiff had active

disease.  Tr. 183.  In so concluding, Dr. Brooks noted that plaintiff had several risk factors for hepatitis C

(IV drug use, tattoos and multiple sexual partners).  Tr. 183.  He planned the following:

> ANA antinuclear antibody, antimotochondrial antibody, serum iron level, ferritin level,
> alpha 1 antitrypsin level, and serum plasma level.  An anti-HCB by riva will be considered.
> HCV RNA quantitative implications will probably also be needed prior to proceeding with
> the anticipated liver biopsy.

Tr. 183.

On October 10, 1997, plaintiff had a liver biopsy.  Tr. 178, 185.  A microscopic examination

revealed the following diagnosis:

> Chronic hepatitis with moderate inflammatory activity (piecemeal necrosis) and bridging fibrosis suggestive of cirrhosis, consistent with the patient's history of hepatitis C infection.

Tr. 178.  The pathologist commented as follows:

> The liver biopsy demonstrates the features of hepatitis C infection.  There is moderate inflammatory activity and bridging portal-to-portal fibrosis which is suggestive of cirrhosis. These histologic [sic] features are best classified as grade 3/4 (moderate inflammatory activity) and grade 4/4 (degree of fibrosis).

Tr. 179.

On October 10, 1997, x-ray examinations of plaintiff's chest and abdomen revealed a normal chest and a "very thin collection of fluid anterior to the right lobe of the liver" which was consistent with "a very small amount of hemorrhage."  Tr. 186-87.

On October 24, 1997, Dr. Brooks' office informed plaintiff that he had significant liver disease, i.e. cirrhosis.  Tr. 177.  On October 28, 1997, plaintiff visited Dr. Brooks complaining anorexia and vague upper abdominal pain which initially responded to antacids but recently responded only to OTC H2 blockers.  Tr. 175.  Dr. Brooks answered plaintiff's questions regarding hepatitis C and noted that plaintiff had reduced his alcohol consumption to one drink every two to three months.  Tr. 175.  Dr. Brooks reviewed the following symptoms:

| | |
|---|---|
| GEN: | Denies fever, chills, weakness or night sweats.  He complains of fatigue. |
| HEENT: | Denies HA, ear pain tinnitus, sinusitis, epistaxis, hoarseness, double vision, blurred vision, impaired hearing or vision.  He complains of a sore throat. |
| CHEST: | Denies SOB, wheezing, cough, hemoptysis or sputum production. |
| CV: | Denies chest pain, palpitations, orthopnea, LE claudication, LE edema or cyanosis. |
| NEURO: | Denies seizures, paralysis, paresis, paresthesias, sensory changes or disturbances in gait, smell, taste or speech. |

6

MS:        Denies arthralgias, back pain or muscle wasting.   He complains of
            myalgias.
SKIN:      Denies lesions, bruising or pigmentation changes.  He complains of rashes
            and pruritus.

Tr. 175.  Dr. Brooks diagnosed hepatitis C with grade 3/4 inflammation and stage 4/4 fibrosis.  Tr. 176.

He recommended that plaintiff refrain from all alcohol consumption, obtain an HCV RNA QA test and

review an interferon video tape.  Tr. 176.

On November 14, 1997, Dr. Brooks received the results of the HCV RNA QA test.  Tr. 189.

The lab reported as follows:

Positive for INTERMEDIATE LEVEL HCV RNA based on our clinical research studies.
May respond favorably to standard doses of alpha interferon, or may require either more
frequent dosing of interferon, higher doses of interferon,  or longer duration of therapy to
achieve adequate response.

Tr. 189.  On the same day, after a telephone conversation with plaintiff, Dr. Brooks noted the following:

He is having [right upper quadrant] and right sided chest pain.  The most severe location
is near the liver biopsy site.  This has been present for the past 4-5 days.  He has nausea
but no vomiting, fever or chills.  He is not certain whether this is reminiscent of the kidney
stone pain.  An abdominal sonogram and a UA will be obtained on 11/17/97.

Tr. 174.

On November 17, 1997, a sonogram of plaintiff's abdomen reflected gallstones.  Tr. 184.

On November 20, 1997, in a telephone conversation with Dr. Brooks, plaintiff complained  of right

upper quadrant pain radiating into the back with associated nausea.  Tr. 173.  Plaintiff told Dr. Brooks that

he planned to see a surgeon from North Kansas City Hospital for gallstones and that he would contact Dr.

Brooks after the surgery to discuss interferon therapy.  Tr. 173.

On December 1, 1999, plaintiff completed six months of interferon/ribavirin therapy under the care

of Bradley Freilich, M.D.  Tr. 266.  Dr. Freilich noted that plaintiff tolerated the treatment "fairly well."  Tr.

266.  He reported as follows:

> * * * His hemoglobin and white count remain stable.  His viral count has been negative up
> to this point, although his liver enzymes have never normalized.
>
> He is complaining of some mild right elbow pain.  He has been off work and is now going
> to be looking for a job.
>
> We will follow him closely over the next six months to look for evidence of relapse which
> is slightly higher given the fact that his liver enzymes have never normalized.  I will begin him
> on ibuprofen 600 mg b.i.d. for his right elbow pain.  If he develops any abdominal pain or
> GI bleeding, of course, he is to contact me as soon as possible.

Tr. 266.

On March 20, 2000, plaintiff saw Timothy C. Frey, D.O., for bilateral hip pain.  Tr. 236.  X-rays

were negative.  Tr. 236, 240-41.  Dr. Frey noted no evidence of generalized arthritis and no history of

rheumatoid, etc.  Tr. 236.  He planned for plaintiff to try Celebrex and to see orthopedics if the pain did

not improve.  Tr. 236.

On November 1, 2000, plaintiff returned to Dr. Frey for pain in his left palm.  Tr. 235.  Dr. Frey

suspected an overuse syndrome but planned to check x-rays for a fracture.  Tr. 235.  X-rays revealed the

following impression: "Soft tissue foreign body noted.  There is no bone abnormality identified."  Tr. 239.

On January 2, 2001, Joi McNeley-Phelps, Ph.D., performed a consultative exam of plaintiff.  Tr.

196-99.  Dr. McNeley-Phelps noted that plaintiff complained as follows:

> Mr. McKitrick said that he is applying for disability income because "I'm not able to do
> the kind of work I've always done."  He went on to say that he had been making a lot of
> mistakes on his job the last year he worked.  He said his current symptoms are memory
> problems, arthritis, and shortness of breath whenever he works hard.  Of his memory
> problems, he said, "I have no short-term memory."  When asked for specification, he said
> that he has trouble remembering names and phone numbers and that part of his job

> required that he remember numbers.  He said his only current treatment is some herbal treatment that he uses for his liver.  He said he takes no medication.  He said his only mental health treatment was when he was a teenager.

Tr. 196.  Plaintiff reported that he slept between 14 and 15 hours a day and that his appetite was not good.

Tr. 198.  He stated that he used to enjoy several activities in the past, such as three-wheeling and four-wheeling, but that he could no longer do them because of pain in his hips and elbows.  Tr. 198.  Plaintiff said that his energy level was poor.  Tr. 198.  Plaintiff stated that he stopped drinking alcohol when he learned that he had hepatitis but that he continued to use marijuana daily for nausea.  Tr. 197.  As to daily activities, plaintiff stated that he awoke between 3:00 a.m. and 5:00 a.m., got something to eat, watched television for half an hour and went back to bed until sometime between 9:00 a.m. to 1:00 p.m.  Tr. 197.  He sometimes worked on small projects around the house and if it was warm outside, he did automobile maintenance.  Tr. 197.  He sometimes played with his dog, listened to the radio and watched television.  Tr. 197.  Plaintiff reported that he and his wife occasionally visited with neighbors and friends.  For fun, plaintiff and his wife took two or three-hour drives.  Tr. 197.  Plaintiff had driven to the appointment and stated that he usually drove where he needed to go.  Tr. 197.

Dr. McNeley-Phelps detected an odor of marijuana and observed that plaintiff appeared somewhat depressed, which she thought may have been caused by marijuana.  Tr. 198.  Dr. McNeley-Phelps described plaintiff's orientation, attention, concentration and memory as follows:

> Mr. McKitrick was oriented to person, place, and time (other than saying that he thought the day of the week was Wednesday, when actually it was Tuesday).  He remarked, "I really don't have to deal with calendars anymore."  He was able to perform simple and more complicated mathematical calculations.  He had some difficulty with serial-3 additions and remarked in the middle of them, "This is pissing me off.  I used to be able to do numbers."  However, he was able to get back on track and perform them accurately.  He made one mistake doing serial-7 subtractions, but otherwise was able to do them

9

accurately.  He recalled six digits forward on Digit Span.  He remembered two of three objects after one minute and after five minutes.  He was able to describe a current news event and a memory from childhood.

Tr. 198.  She summarized her impression as follows:

> Mr. McKitrick appeared to be depressed and described some depressive symptoms.  However, given his extensive and long-term use of marijuana, the only diagnosis I would give him at this time would be cannabis abuse on Axis I.  I would defer an Axis II diagnosis.  Overall, he seemed to have adequate concentration, attention, and memory.  He said that tonight he was thinking pretty clearly, whereas his abilities wax and wane depending on his physical health.  He remarked, "Some days I wake up and feel like I did when I was 18.  Some days I wake up confused and don't even know if I can get out of bed."  Overall, he might be able to maintain full-time employment if he were doing fairly simple, repetitive work.  By his report, he is unable to do the physical labor he used to do.  He is probably capable of managing his own funds or, at least, responsibly directing his wife on how to use them.

Tr. 199.

On January 3, 2001, plaintiff visited Dr. Frey with complaints of difficulty urinating.  Tr. 234.  Dr. Frey suspected kidney stones.  Tr. 234.[2]

On January 4, 2001, Peter I. Vilkins, D.O., reported that he had examined plaintiff to evaluate pain in the hypothenar area of his left hand.  Tr. 202.  Plaintiff stated that the pain had started three months ago, when he was working on a pump with a wrench.  Tr. 202.  X-rays revealed a soft tissue foreign body over the distal phalanx of the ring finger and an EMG examination was normal.  Tr. 202.  A physical exam revealed mild tenderness over the pisiform bone and no neurovascular deficit.  Dr. Vilkins made the following impression: "Probable contusion, pisiform bone, left hand."  Tr. 202.  He planned the following treatment: "The patient was placed in a wrist immobilizer.  As the patient has Hepatitis C, I did not place

---

[2]      The remainder of Dr. Frey's notes are not legible.  See Tr. 234.

him on anti-inflammatories.  The patient will return on a p.r.n. basis." Tr. 202.

On January 6, 2001, John C. Verstreate, D.O., examined plaintiff for the Disability Determination

Service in Topeka, Kansas.  Tr. 203.  Dr. Verstreate noted that plaintiff's chief complaints were hepatitis

C, arthritis and hearing loss.  Tr. 203.  After physically examining plaintiff, Dr. Verstreate concluded as

follows:

> The patient reports a history of hepatitis C, status post biopsy.  Today, no hepatic
> enlargement or splenomegaly appreciated.  No evidence of ascites or jaundice.  The
> patient does not appear malnourished.  No objective evidence of any function impairment
> noted clinically.  The patient describes a history of multiple joint pain today, with an almost
> claw like appearance to the left foot when standing, however, this does not effect gait and
> station.  Grip strength and dexterity are preserved.  I find no evidence of inflammatory
> change, hyperthermia or erythema.  Chest x-ray enclosed and shows respiratory effort is
> shallow.  Bony thorax and soft tissues are intact as visualized.  Cardiomediastinal structures
> are unremarkable as displayed.  The CT ratio is 15/29.5 cm is compatible with margin
> cardiac prominence, however it is likely that the cardiac shadow is slightly magnified due
> to the poor inspiration.  Lung fields are clear.

Tr. 206.

On January 10, 2001, plaintiff saw Scott A. Montgomery, M.D., regarding abdominal pain.  Tr.

208, 210.  Due to plaintiff's urinary frequency and right lower quadrant pain, Dr. Montgomery suspected

a distal ureteral calculus and planned an intravenous pyelogram ("IVP").[3]  Tr. 208, 210.  The IVP revealed

possible right nephrolithiasis[4] with a minimal calcification suspected in the lower pole of the right kidney.

Tr. 213.

On February 14, 2001, plaintiff saw Dr. Freilich with complaints of fatigue, abdominal pain and

---

[3]       A pyelogram involves a radiograph or series of radiographs of the renal pelvis and ureter,
following injection of contrast medium.  See Stedman's Medical Dictionary 1488 (26th ed. 1995).

[4]       "Nephrolithiasis" means presence of renal calculi, or kidney stones.  See Stedman's
Medical Dictionary at 1191, 268-69.

joint pain.  Tr. 265.[5]

On February 15, 2001, Charles L. Warrender, M.D., performed a psychiatric consultation with plaintiff.  Tr. 216-30.  Dr. Warrender observed that plaintiff appeared unkempt and that he omitted an odor which smelled like marijuana.  Plaintiff told Dr. Warrender that he continued to use marijuana on a daily basis and smoked four to five joints a day.  Dr. Warrender found that based on plaintiff's substance addiction disorders, his medical disposition met listing 12.09.  Tr. 216; see 20 C.F.R. Pt. 404, Subpt. P, App. 1, Pt. A.  Dr. Warrender indicated that plaintiff displayed "[p]athological dependence, passivity, or aggressivity" and "[i]ntense and unstable interpersonal relationships and impulsive and damaging behavior." Tr. 223.  Dr. Warrender also found that plaintiff displayed behavioral changes or physical changes associated with the regular use of substances that affect the central nervous system and that plaintiff displayed a personality disorder under listing 12.08.  Tr. 224.  On a scale ranging from none, mild, moderate, marked and extreme, with marked and extreme indicating the degree of limitation which satisfies the functional criterion, Dr. Warrender found that plaintiff had marked difficulties in maintaining social functioning and marked difficulties in maintaining concentration, persistence or pace.  Tr. 226.  Dr. Warrender concluded that plaintiff had a severe impairment which met 12.09.  Tr. 230.  He opined that plaintiff's "marijuana abuse would certainly account for memory loss and mental confusion."  Tr. 230.

On February 22, 2001, plaintiff underwent a esophagogastroduodenoscopy (EGD)[6] at Saint Joseph Health Center.  Tr. 245-47.  The exam revealed normal upper gastrointestinal mucosa with no

---

[5]       Dr. Freilich's handwritten notes of the visit are not legible.  See Tr. 265.

[6]       An EGD is an endoscopic examination of the esophagus, stomach and duodenum usually performed using a fiberoptic instrument.  See Stedman's Medical Dictionary at 619.

evidence of varices. Tr. 246. Dr. Freilich opined that plaintiff's right upper quadrant pain was likely to due to hepatic swelling due to hepatitis C. Tr. 246. He recommended that plaintiff take 100 mg of Ultram twice daily. Tr. 246.

On April 16, 2001, plaintiff visited Dr. Freilich with complaints of chronic fatigue. Dr. Freilich noted that plaintiff had been a previous relapser to Rebetron therapy and that plaintiff was "requesting disability because of his inability to work the necessary hours to operate as a machinist, which is his only skill." Tr. 264. Dr. Freilich further reported as follows:

> The patient likely has significant fatigue due to his underlying cirrhosis. While on therapy, he will likely suffer even more fatigue, and energy loss.
>
> We will likely start him on pegylated interferon/Ribavirin therapy for his underlying cirrhosis in the next few weeks.
>
> A recent alpha-fetoprotein level was 80, but a CT scan of the abdomen did not show any evidence of tumor. A repeat alpha-fetoprotein level should be drawn every three months.

Tr. 264.

On June 14, 2001, plaintiff saw Nancy J. Becker, M.D., for arthritic evaluation. Tr. 252. Dr. Becker diagnosed osteoarthritis and hepatitis C. Tr. 252,253.

July 25, 2001, plaintiff saw Dr. Freilich with complaints of fatigue and joint pain. Tr. 263.[7]

On June 28, 2001, plaintiff returned to Dr. Becker, who reported that x-rays confirmed her suspicion of degenerative changes, relatively mild at the time. Tr. 249. She opined that plaintiff was suffering primarily from mild osteoarthritis and benign arthralgias associated with underlying hepatitis C.

---

[7]     Dr. Freilich's handwritten notes of the visit are not legible. See Tr. 263.

Tr. 249.  Dr. Becker noted that plaintiff had interferon and remeron therapy in 1999 and that he was

currently under consideration for re-treatment.  Tr. 253.  Dr. Becker noted that diflunisal, Ultram, Celebrex

and Vioxx had not been effective, that she was giving him samples of Relafen and that if it was effective,

he should follow up with Dr. Frey for a prescription.  Tr. 249.

On July 21, 2001, Dhanunjaya Lakkireddy, M.D., evaluated plaintiff for the Disability

Determination Service in Topeka, Kansas.  After physically examining plaintiff, Dr. Lakkireddy concluded

as follows:

> The patient reports a history of [hepatitis C with history of cirrhosis, arthralgias], status
> post biopsy.  Recent CT scan reported elevated alpha feta protein, but again negative CT
> scan except for the fatty infiltrate.  Today, the liver is 4 cm enlarged.  No spenomegaly or
> ascites.  There are multipl[e] spiker nevi, gynecomastia and diminished testicular volume.
> There is no evidence of jaundice or cerebellar findings.  Again no evidence of ascites.  The
> patient does show pain in multiple joint regions, but preserved range of motion.  I find no
> evidence of inflammatory change, hyperthermia or erythema.

Tr. 260.

On August 29, 2001, Gerald H. Vandenberg, Ph.D., evaluated plaintiff psychologically.  Tr. 299-

301.  Dr. Vandenberg noted that plaintiff complained chiefly of aching joints since his interferon treatment

two years ago, low energy from his current treatment, liver damage, deteriorating eyesight, memory

problems and osteoarthritis.  Tr. 299.  Regarding plaintiff's history, Dr. Vandenberg reported as follows:

> Mr. McKitrick said he was told he probably had the hepatitis for 15 years and thought he
> might have gotten it from drug use.  He mostly used speed, but also continued to use
> marijuana until about six months ago.  He quit all drugs because his doctor told him if he
> didn't he would not be eligible for a liver transplant.  He also does not drink, though
> records report that he used to.
>
> Mr. McKitrick described his moods as irritable and frustrated, worse with the Interferon
> medication.  "It makes everything hurt and ache three or four days after the shots.  And I
> don't remember the first day or two after."

14

* * * Mr. McKitrick said he last worked about two years ago as a heavy industry machinist.  He said he was let go because of the illness, adding that the company wanted him to work 50 to 60 hours a week and he couldn't do that with the treatment he was receiving.

Tr. 299.  Regarding plaintiff's activities, Dr. Vandenberg reported as follows:

A typical day was said to be one in which he awakens about 3:00 or 4:00 AM and watches the news.  He may go back to sleep until anywhere between 10:00 AM and 3:00 PM, then gets up again to read or watch TV.  Often he will just have the TV on and not watch it.  His wife gets home from work between 6:00 and 7:00 PM and they will have dinner.  "Half the time I'm asleep by 8:00 or 8:30 in the living room."  Hobbies were denied.  Social activities consisted of visiting with friends, mostly when they come over on weekends.

Tr. 300.  Dr. Vandenberg noted that plaintiff's wife had driven him to the appointment and that plaintiff

appeared pail and rather unkempt.  Specifically, Dr. Vandenberg observed as follows:

He appeared depressed, tense, and somewhat affectively defeated.  Mr. McKitrick complained of significant difficulty sleeping, much of which he attributed to effects of the Interferon.  He also commented that after treatments he naps eight to 20 times a day because of feeling sore and sick, then he is okay for a while.  He also said his appetite is poor after treatments, getting better after two or three days.

Verbal abstract reasoning was adequate. * * *

Attention and concentration were variable.  Asked to count to 40 by three's beginning with one, he made one error but spontaneously corrected it, taking 35 seconds to complete the task.  He then spelled "world" backward as "DLORW."  He recited six digits forward and five backward, but was mainly able to do so after missing a first sequence of four, five and six digits.

General fund of information was fairly good. * * *

Tr. 301.  Dr. Vandenberg concluded that plaintiff displayed an overall impression of "a Dysthymic Disorder

of variable intensity, complicated by apparently medication side effects."[8]  Tr. 301.  He opined that plaintiff

was able to manage funds.  Tr. 301.

On August 30, 2001, Kyle Timmerman, M.D., performed a residual functional capacity

assessment.  Tr. 303-11.  After reviewing plaintiff's medical records, Dr. Timmerman concluded that

plaintiff could lift up to 10 pounds frequently and could stand or walk at least two hours in an eight hour

work day and sit for four to six hours in an eight hour work day.  Tr. 303, 309.  Dr. Timmerman

acknowledged that plaintiff's liver disease and medication could result in "significant fatigue" and stated that

because of fatigue and osteoarthritis, he should avoid ladders, ropes and scaffolds and should only

occasionally climb stairs, stoop, kneel, crouch and crawl.  Tr. 309.

On September 24, 2001, Harvey L. Schloesser, M.D., reviewed plaintiff's psychological records

and concluded that his dysthymia was not severe.  Tr. 327.

### D.     Medical Expert

George R. Chance, a psychologist, testified as a medical expert to the following facts:

Plaintiff's medical records from 2001 indicate a mild depressive disorder and a substance addiction

disorder.  Tr. 360-61.  It is likely that plaintiff's daily marijuana use caused his mild depressive disorder.

Tr. 361.  It is also possible – but not likely – that the interferon treatment caused depression as a side

effect.  Tr. 362.  Fatigue is a common side effect of interferon treatment.  Tr. 362.  It is possible that fatigue

contributed to plaintiff's depression.  Tr. 363.[9]

––––––––––––––––––––

[8]      A dysthymic disorder refers to a chronic disturbance of mood characterized by mild depression or loss of interest in unusual activities.  See Stedman's Medical Dictionary at 526.

[9]      Dr. Chance did nor review any medical records for the time period after 2001 and does not know anything about plaintiff's current condition.  Tr. 361.

### E.    Vocational Expert

Richard Sherman testified as a vocational expert.  The ALJ asked Sherman to consider the following hypothetical:

> claimant has cirrhosis of the liver and hepatitis of unknown causes, a mild depressive disorder, and complaints of joint pain, especially in the knees, described as due to osteoarthritis in the knees . . . . [T]his claimant would be restricted to work that would not require him to, say, lift and carry objects in excess of 10 pounds at a maximum and perhaps two or three pounds or so with greater frequency, where the claimant would need the opportunity to sit or stand during the course of a work day to alleviate discomfort and to accommodate his complaints of fatigue and being tired.

Tr. 366.  Based on this hypothetical, Sherman testified that plaintiff could not perform his past work as a machinist but that he could perform other jobs such as a bench assembler, electrical assembler and surveillance systems monitor.  Tr. 367.  Sherman opined that for positions with a sit-stand option, 9,953 bench assembler positions existed nationally with 767 located in Missouri; 28,000 electrical assembler positions existed nationally with 800 located in Missouri; and 76,000 surveillance system monitor positions existed nationally with 750 located in Missouri.

The ALJ also asked Sherman to consider the same hypothetical but with a claimant whose concentration, persistence and pace were significantly impaired by fatigue, pain and discomfort either because of a liver condition or because of the continuing effects of past medication.  Tr. 368.  Based on this hypothetical, Sherman testified that the claimant would not be employable.  Tr. 368.

Finally, the ALJ asked Sherman to consider the same hypothetical but to assume that claimant might miss two or three or more days of work per month due to fatigue, pain and discomfort.  Tr. 368.  Based on this hypothetical, Sherman testified that the claimant would not be employable.  Tr. 368.

### III.    ALJ's Findings

17

The ALJ made the following findings:

1.      The claimant met the earnings requirement of the Act on April 22, 1999 and continued to meet them through the date of this decision.

2.      The claimant has not engaged in substantial gainful activity since April 22, 1999.

3.      The medical evidence establishes that the claimant has the following severe impairments: cirrhosis of liver secondary to hepatitis C and very mild medical joint space narrowing of the knees with some increased subchondral sclerosis.  Nevertheless, he does not have an impairment or combination of impairments listed in, or medically equal to one listed in 20 C.F.R. Part 404, Appendix 1, Subpart P.

4.      The claimant's testimony and that of his witness is not found credible when considered in light of the medical signs and findings, history of medical treatment, reports of treating and examining physicians and the inconsistencies in the claimant's testimony, all of which is discussed more fully in the Rationale section of this decision.

5.      The claimant had the residual functional capacity to perform work-related activities except for lifting or carrying more than ten pounds maximum occasionally and two or three pounds frequently and would require a sit/stand option in competitive employment (20 C.F.R. § 404.1545).

6.      The claimant is unable to perform his past relevant work.

7.      The claimant is a younger individual (20 C.F.R. § 404.1563) and has the equivalent of a high school education (20 C.F.R. § 404.1564).

8.      The claimant has no acquired work skills that are transferable to semi-skilled or skilled work functions or other work within his residual functional capacity (20 C.F.R. § 404.1568).

9.      After considering the claimant's above described residual functional capacity for a range of work and age, education and past relevant work, the undersigned Administrative Law Judge is persuaded that the claimant would be able to make a vocational adjustment to work which exists in significant numbers in the local and national economies.

10. The claimant has not been under a "disability," as defined in the Social Security Act, as amended, since April 22, 1999 and through the date of this decision (20 C.F.R. § 404.1520(f)).

Tr. 37-38.

## IV.     Standard of Review

The ALJ's decision is binding on the Court if supported by substantial evidence. See 42 U.S.C. § 405(g); Dixon v. Heckler, 811 F.2d 506, 508 (10th Cir. 1987). The Court must determine whether the record contains substantial evidence to support the decision and whether the ALJ applied the proper legal standards. See Castellano v. Sec'y of HHS, 26 F.3d 1027, 1028 (10th Cir. 1994). While "more than a mere scintilla," substantial evidence is only "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971). The Court must scrutinize the record and take into account any evidence which fairly detracts from the evidence which supports the Secretary's findings. See Nieto v. Heckler, 750 F.2d 59, 61 (10th Cir. 1984). Evidence is not substantial "if it is overwhelmed by other evidence – particularly certain types of evidence (e.g., that offered by treating physicians) – or if it really constitutes not evidence but mere conclusion." Knipe v. Heckler, 755 F.2d 141, 145 (10th Cir. 1985) (quoting Kent v. Schweiker, 710 F.2d 110, 114 (3d Cir. 1983)).

## V.     Analysis

Plaintiff claims that the ALJ erred by discounting his credibility and by not including his non-exertional limitations in the hypothetical questions to the vocational expert. Plaintiff bears the burden of proving disability under the SSA. See Henrie v. U. S. Dep't of HHS, 13 F.3d 359, 360 (10th Cir. 1993); Ray v. Bowen, 865 F.2d 222, 224 (10th Cir. 1989). The SSA defines "disability" as the inability to

19

engage in any substantial gainful activity for at least twelve months due to a medically determinable impairment.  See 42 U.S.C.A. § 423(d)(1)(A).  To determine whether a claimant is disabled, the Commissioner applies a five-step sequential evaluation: (1) whether the claimant is currently working; (2) whether the claimant suffers from a severe impairment or combination of impairments; (3) whether the impairment meets an impairment listed in Appendix 1 of the relevant regulation; (4) whether the impairment prevents the claimant from continuing his past relevant work; and (5) whether the impairment prevents the claimant from doing any kind of work.  See 20 C.F.R. §§ 404.1520,  416.920 (1996).  If a claimant satisfies steps one, two and three, he is disabled; if a claimant satisfies steps one and two, but not three, then he must satisfy step four.  If he satisfies step four, the burden shifts to the Commissioner to establish that the claimant is capable of performing work in the national economy.  See Williams v. Bowen, 844 F.2d 748, 751 (10th Cir. 1988).  In this case, the ALJ denied benefits at step five, finding that although plaintiff's impairments prevent him from performing past relevant work, he is capable of performing other jobs which exist in significant numbers in the national economy.  Tr. 22.

### A.    Credibility Determination

Plaintiff asserts that substantial evidence does not support the ALJ decision to discount his complaints of debilitating pain and fatigue.  The Tenth Circuit has set forth the following factors for analyzing subjective complaints of disabling conditions: (1) whether claimant proves with objective medical evidence an impairment that causes the subjective condition; (2) whether a loose nexus exists between the impairment and the subjective condition; and (3) whether the subjective condition is disabling based upon all objective and subjective evidence.  See Glass v. Shalala, 43 F.3d 1392, 1395 (10th Cir. 1994); Luna v. Bowen, 834 F.2d 161, 163-64 (10th Cir. 1987).  Because plaintiff satisfied the first two factors, the

ALJ had to consider plaintiff's assertions regarding subjective conditions and decide whether he believed

them.  See Luna, 834 F.2d at 163.

> With respect to credibility, the ALJ stated as follows:
>
> Considering the medical evidence, the claimant's work activity and the claimant's assertions about his activities from the alleged onset date, the Administrative Law Judge cannot find the allegations of disability and limitations upon claimant's residual functional capacity credible.  The Administrative Law Judge finds claimant['s] complaints concerning his symptomatology inconsistent with clinical findings in the reports of medical professionals and signs and symptoms cited above, as well as the claimant's statements therein.  The claimant's work activity reveals he has a steady work history with average earnings and last worked in 2000.  The undersigned notes that the claimant was employed from April 6, 2000 through November 30, 2000 and earned gross wages of $6,581.45.  This work activity is inconsistent with the claimant's allegation that he was disabled and indicative of an ability to work. . . . Regarding the type, dosage, effectiveness and adverse side effects of medication, the claimant testified that he was not taking any medication currently.  There was no indication in the evidence of record that the claimant's medications were not efficacious when taken as prescribed.  As for treatment other than medication, the claimant did not participate in counseling or physical therapy.  The claimant's allegation of disability is inconsistent with the December 1, 1999  progress note that indicated that he had completed a six month course of Interferon/Ribavirin therapy and tolerated it very well and his ability to work from April 6, 2000 through November 30, 2000. * * *

Tr. 35.

> In reviewing the credibility determination, the Court should "defer to the ALJ as trier of fact, the

individual optimally positioned to observe and assess witness credibility."  Casias v. Sec'y of HHS, 933

F.2d 799, 801 (10th Cir. 1991).  Credibility is the province of the ALJ.  Hamilton v. Sec'y of HHS, 961

F.2d 1495, 1499 (10th Cir. 1992).  At the same time, the ALJ must explain why specific evidence relevant

to each factor supports a conclusion that a claimant's subjective complaints are not credible.  See Kepler

v. Chater, 68 F.3d 387, 391 (10th Cir. 1995).  But see Qualls v. Apfel, 206 F.3d 1368, 1372 (10th Cir.

2000)  (Kepler does not require formalistic factor-by-factor recitation of evidence).  Findings as to

credibility should be closely and affirmatively linked to substantial evidence and not just a conclusion in the guise of findings. Kepler, 68 F.3d at 391 (quoting Huston v. Bowen, 838 F.2d 1125, 1133 (10th Cir. 1988)) (footnote omitted).  In making a finding about the credibility of an individual's statements, the adjudicator need not totally accept or totally reject the individual's statements.  See Social Security Ruling 96-7p, 61 Fed. Reg. at 34486.  Rather, the ALJ "may find all, only some, or none of an individual's allegations to be credible."  See id.

Plaintiff asserts that the ALJ erroneously found that plaintiff earned gross wages of $6,581.45 between April 2000 and November 2000, when in fact plaintiff did not earn any income in 2000.[10] Defendant agrees that plaintiff did not earn income in 2000 but argues that the ALJ considered other factors which support his credibility determination.  The Court, however, has no way to determine what amount of weight the ALJ placed on the erroneous earning information.  This ground alone is sufficient to reverse the ALJ determination.  See Sokolowski v. Bowen, No. 86-0729, 1987 WL 8089, *2 (E.D.N.Y. Feb. 26, 1987) (credibility decision should not be based on factual errors).  Nevertheless, the Court will briefly address plaintiff's remaining arguments.

Plaintiff contends that substantial evidence does not the ALJ conclusion that he exaggerated his symptoms of debilitating fatigue, joint pain and abdominal pain, and that medical sources do support his claims.  In determining the credibility of plaintiff's testimony, the ALJ should consider such factors as

> the levels of medication and their effectiveness, the extensiveness of the attempts (medical or nonmedical) to obtain relief, the frequency of medical contacts, the nature of daily activities, subjective measures of credibility that are peculiarly within the judgment of the ALJ, the motivation of and relationship between the claimant and other witnesses, and the

---

[10]    The ALJ apparently relied on earning records of an unrelated party.  See Tr. 82, 84.

22

consistency or compatibility of nonmedical testimony with objective medical evidence.

Huston, 838 F.2d at 1132.

It appears that the ALJ considered appropriate factors, but it is difficult to find record support for his conclusions. For instance, the ALJ noted that plaintiff was not taking medication and that "[t]here was no indication in the evidence of record that the claimant's medications were not efficacious when taken as prescribed." Tr. 35. Dr. Becker's notes from June of 2001, however, stated that plaintiff was currently under consideration for re-treatment of interferon and Remeron therapy and that he had tried diflunisal, Ultram, Celebrex and Vioxx, but they were not effective. Tr. 253. The ALJ noted that plaintiff did not participate in counseling or physical therapy, see Tr. 35, but nothing in the record suggests that anyone recommended such services for him. The ALJ repeatedly referred to the progress note dated December 1, 1999, which indicated that plaintiff had completed a six-month course of Interferon/Ribavirin therapy and tolerated it "very well." See Tr. 35-36. The progress note actually states that plaintiff tolerated the therapy "fairly well" and that his liver enzymes never normalized. Tr. 266. The ALJ did not discuss the fact that plaintiff relapsed in 2001 and had a second round of interferon/Ribavirin therapy. See Tr. 264, 253, 301. The ALJ did not discuss the fact that plaintiff had repeatedly sought medical help for his complaints, that Dr. Freilich stated that plaintiff "likely has significant fatigue due to his underlying cirrhosis" and that Dr. Timmerman stated that plaintiff's liver disease could result in "significant fatigue." See Tr. 264, 309. On remand, the ALJ should discuss plaintiff's credibility with respect to each symptom and specifically state what record evidence supports his conclusions in that regard. See Kepler, 68 F.3d at 391.

Plaintiff asserts that new evidence which he submitted to the appeals council corroborates his

complaints of debilitating pain and fatigue. New evidence which is submitted to the appeals council becomes part of the administrative record which the Court considers when evaluating whether substantial evidence supports the disability determination. See O'Dell v. Shalala, 44 F.3d 855, 859 (10th Cir. 1994). On remand, the ALJ should consider whether such evidence is material and related to the period on or before the date of the ALJ decision. See Threet v. Barnhart, 353 F.3d 1185, 1191 (10th Cir. 2003); Box v. Shalala, 52 F.3d 168, 171 (8th Cir. 1995).

### B.       Hypothetical Question To Vocational Expert

Plaintiff asserts that the ALJ erred in not including his non-exertional limitations in the hypothetical questions to the vocational expert. In his decision, the ALJ found that plaintiff would have a mild degree of limitation in social functioning, concentration, persistence or pace. See Tr. 33. His hypothetical questions to the vocational expert, however, did not include such limitations. Moreover, in concluding that plaintiff's limitations were mild, the ALJ did not state why he concluded differently than Dr. Warrender, who found that plaintiff had marked difficulties in maintaining social functioning, concentration, persistence or pace. See Tr. 226. Hypothetical questions must include a full description of a claimant's impairments in order for the testimony elicited by such questions to constitute substantial evidence to support the ALJ decision. See Hargis v. Sullivan, 945 F.2d 1482, 1492 (10th Cir. 1991). In formulating the hypothetical question, the ALJ need not include any alleged limitations which he does not accept as true. See Roberts v. Heckler, 783 F.2d 110, 112 (8th Cir. 1985). Rather, the ALJ may restrict his hypothetical to those limitations which he has found to exist based upon substantial evidence in the record. See Gay v. Sullivan, 986 F.2d 1336, 1341 (10th Cir. 1993). On remand, the ALJ should include in the hypothetical questions to the vocational expert any limitations which he finds to exist based upon substantial evidence in the

record.

Plaintiff urges the Court to direct the Commissioner to award benefits, asserting that further fact finding would serve no purpose.  The Court disagrees.  The record in this case does not support a determination that plaintiff is disabled as a matter of law.  Cf. Sorenson v. Bowen, 888 F.2d 706, 713 (10th Cir. 1989).  The Court therefore overrules plaintiff's request.

**IT IS THEREFORE ORDERED** that plaintiff's Motion For Judgment (Doc. #3) filed November 21, 2001 be and hereby is **SUSTAINED in part.**  This case is reversed and remanded pursuant to sentence four of 42 U.S.C. § 405(g) for further proceedings in accordance with this opinion.

Dated this 12th day of April, 2005 at Kansas City, Kansas.

s/ Kathryn H.  Vratil
Kathryn H. Vratil
United States District Judge